**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROGER J. FERGUSON and MICHAEL J. TOMANA,** | ) ) ) |
| **Plaintiffs,** | ) ) **2:16-cv-41** |
| **v.** | ) ) ) |
| **JOHN J. MOELLER, MEGAN KRESS, KIMBERLY A. CONNELL and GREGORY C. CONNELL,** | ) ) ) ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

Now pending before the Court is a MOTION TO DISMISS PLAINTIFFS' AMENDED

COMPLAINT PURSUANT TO RULE 12(b)(6) FILED ON BEHALF OF DEFENDANT JOHN

J. MOELLER (ECF No. 25), with brief in support.  Plaintiffs Roger Ferguson and Michael

Tomana have filed a response in opposition to the motion and an Addendum to their response

(ECF Nos. 29, 29-1).[1]  The motion is ripe for disposition.[2]

Factual and Procedural History

This is the Court's second opinion regarding the contours of RICO claims arising out of

alleged fraudulent sales of Civil War memorabilia.  On March 22, 2016, the Court granted

Defendant Moeller's motion to dismiss the RICO claims in the original Complaint and granted

Plaintiffs leave to amend.  On April 12, 2016, Plaintiffs filed an Amended Complaint.  Plaintiffs

have abandoned their claim under RICO § 1962(b), but continue to assert claims under RICO §§

1962(c) and (d).  Moeller has renewed his motion to dismiss the RICO claims set forth therein.

---

[1] The Court greatly appreciates the efforts by Plaintiffs' counsel to clearly set forth the various alleged predicate acts in the Addendum.
[2] The Court has concluded that oral argument is not necessary.  Accordingly, the Motion to Schedule Oral Argument (ECF No. 32) is **DENIED**.

In resolving the instant motion, the Court has accepted as true the specific facts set forth in the 61-page Amended Complaint (ECF No. 23) and the 38-page RICO Case Statement (ECF No. 24). *See Glessner v. Kenny*, 952 F.2d 702, 712 n. 9 (3d Cir. 1991), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 260 (3d Cir. 1995) ("Courts may consider the RICO case statements in assessing whether plaintiffs' RICO claims should be dismissed.").

Plaintiffs are collectors of historical artifacts, with a particular interest in Civil War items. Amended Complaint ¶ 62. Robert G. Connell (who is not a party) compiled a unique collection of Civil War artifacts over a period of forty years (the "Connell Collection"), which he maintained at a home and private museum located at 2782 Locust Drive in Peters Township, Washington County, Pennsylvania. At some time prior to 2008, Robert Connell moved out of the home at 2782 Locust Drive and permitted Defendants Gregory Connell (his son), Kimberly Connell (Gregory's wife) and Megan Kress (Kimberly's daughter and Gregory's step-daughter) (collectively, the "Connell Defendants") to live there.[3]

Defendant John J. Moeller operates John's Trading Post, a resale shop in Canonsburg, Pennsylvania. Plaintiffs allege that Moeller and a collection of confederates engaged in three related fraudulent schemes: (1) to loot the Connell Collection of Civil War memorabilia; (2) to obtain other Civil War memorabilia from other collectors and dealers and to falsely portray those items as part of the Connell Collection; and (3) to fraudulently alter Civil War memorabilia by hiring an engraver[4] to place inscriptions which falsely attributed ownership of the items to historically important figures, thus greatly increasing the apparent value of the items. In

---

[3] The Connell Defendants have not responded to the motion, nor has an attorney entered an appearance on their behalf.
[4] The engraver is alleged to be a co-conspirator, but his/her identity is not yet known to Plaintiffs.

addition, Moeller represented that certain items were originals, when he knew that they were reproductions. He also created false provenance documents. In other words, Defendants allegedly intentionally destroyed rare and valuable pieces of history and introduced false artifacts into the thriving Civil War artifact market.

Plaintiffs allege that from 2008-2012, the Connell Defendants looted Robert Connell's private museum and gave Moeller access to take artifacts from the collection. Allegedly, Kress and Kimberly Connell needed money to support their drug habits. Amended Complaint ¶¶ 34, 39. Moeller paid the Connell Defendants a fraction of what the artifacts were worth. Plaintiff alleges, albeit conclusorily, that he then resold them at a massive profit to the general public through many channels, including John's Trading Post, Jack's flea market, on consignment, the Internet, and at gun shows.

In May 2011, Plaintiffs began purchasing items from Moeller at John's Trading Post. Between May 2011 and October 2012, Plaintiffs purchased Civil War memorabilia from Moeller in more than 25 separate transactions totaling some $670,000. Amended Complaint ¶¶ 73, 89. In connection with these transactions, Plaintiff Ferguson travelled to Pennsylvania from his homes in Florida or Tennessee at least eight times and wired money from his Florida bank account to Plaintiff Tomana's bank account in Pennsylvania. On all but one occasion, Plaintiffs then used cash to purchase items from Moeller. The one exception was on May 28, 2011, when Tomana paid Moeller with a $30,000 check.

Plaintiffs allege that the Connell Defendants conspired and participated with Moeller in the fraudulent scheme. To wit, Moeller had Megan Kress execute a false affidavit which indicated that Robert Connell had died and that Megan was the executor of the estate. Amended Complaint ¶ 68(c)-(e). In addition, Megan Kress and Kimberly Connell were physically present

in John's Trading Post when Ferguson and Tomana negotiated to purchase items from Moeller but failed to correct Moeller's misrepresentations regarding such items. Amended Complaint ¶¶ 51, 68. When Plaintiffs determined that certain clothing items were reproductions, rather than originals, the Connell Defendants authorized Moeller to extend a credit to Plaintiffs against future purchases. Amended Complaint ¶ 65. The Connell Defendants are not alleged to have had any involvement in the scheme to obtain memorabilia from other collectors or the engraving scheme, or to have sold any items to Plaintiffs directly.

Plaintiffs planned to sell their collection of Civil War memorabilia at an online auction on November 10, 2012. To promote the auction, Plaintiffs prepared an auction catalog. In addition to items that Moeller had fraudulently sold to Plaintiffs, the catalog contained approximately fifteen items that Moeller still owned, which he had obtained from the Connell Collection or other sources but had not sold to Plaintiffs. Moeller provided false information for these catalog items; fabricated a Prologue which falsely attributed the Connell Collection to a Connell ancestor and member of the Pennsylvania Bucktails; and approved the final version of the catalog. The catalog was distributed by United States mail across state lines to collectors, investors and other potential buyers and was available on the Roan Auction internet site. Plaintiffs also placed advertisements for the auction in publications with national and international circulation.

Prior to the auction, Plaintiffs were notified that many of the items listed for auction had been stolen from Robert Connell and that other items had false provenance claims. The auction was immediately cancelled. Plaintiffs were permitted by law enforcement to retain possession of the items. However, they allege that they have incurred well over one million dollars ($1,000,000.00) in damages. The Amended Complaint asserts the following claims against all Defendants: (Count I) – Civil RICO, pursuant to 18 U.S.C. §§ 1962(c), based on John's Trading

Post as the "enterprise"[5]; (Count II) – Conspiracy to Commit Civil RICO, based on John's Trading Post as the "enterprise"; (Count III) – Civil RICO, pursuant to 18 U.S.C. §§ 1962(c), based on an "association in fact" enterprise; and (Count IV) – Conspiracy to Commit Civil RICO, based on an "association in fact" enterprise. In addition, the Amended Complaint asserts pendent state law claims against all Defendants for fraud, and against Moeller for Breach of Contract; Unjust Enrichment; and Negligent Misrepresentation. There is not complete diversity of citizenship between the parties because Plaintiff Tomana and Defendants are citizens of Pennsylvania.

Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of a complaint, which may be dismissed for the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) Upon review of a motion to dismiss, the Court must accept all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1861 (2012) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)). However, as the Supreme Court of the United States has made clear in *Bell Atlantic Corp. v. Twombly*, such "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. 554, 555 (2007).

The Supreme Court later refined this approach in *Ashcroft v. Iqbal*, emphasizing the requirement that a complaint must state a plausible claim for relief in order to survive a motion to dismiss. 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads

---

[5] This theory resolves many of the Court's misgivings regarding the "association in fact" enterprise alleged in the original Complaint.

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 555). Nevertheless, "the plausibility standard is not akin to a 'probability requirement,'" but requires a plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 555).

To determine the legal sufficiency of a complaint after *Twombly* and *Iqbal,* the United States Court of Appeals for the Third Circuit instructs that a district court must take a three step approach when presented with a motion to dismiss for failure to state a claim. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010) (noting that although *Iqbal* describes the process as a "two-pronged approach," it views the case as outlining three steps) (citing *Iqbal*, 556 U.S. at 675). First, "the court must "tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* at 130 (quoting *Iqbal*, 556 U.S. at 675) (alteration in original). Second, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Third, "'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Accordingly, the Court must separate the factual and legal elements of the claim and "accept the factual allegations contained in the Complaint as true, but [ ] disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (citing *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-57; *Burtch*, 662 F.3d at 220-21). The Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible

claim for relief.'  In other words, a complaint must do more than allege the plaintiff's entitlement

to relief.  A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC*

*Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citing *Iqbal* 556 U.S. at 678).  The determination

for "plausibility" will be "'a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense.'"  *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).

　　　However, nothing in *Twombly* or *Iqbal* changed the other pleading standards for a motion

to dismiss pursuant to Rule 12(b)(6) and the requirements of Rule 8 must still be met.  *See*

*Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (internal citations omitted).  The

Supreme Court did not abolish the Rule 12(b)(6) requirement that "the facts must be taken as

true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff

can prove those facts or will ultimately prevail on those merits."  *Phillips,* 515 F.3d at 231 (citing

*Twombly*, 550 U.S. at 553).  Rule 8 also still requires that a pleading contain a "short and plain

statement of the claim showing that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 677-78

(citing Fed. R. Civ. P. 8(a)(2)).  While this standard "does not require 'detailed factual

allegations,' [ ] it demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation" and a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S.

at 544-55).  Simply put, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with

nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

　　　Where, as here, Plaintiffs assert fraud-related predicate acts to support a RICO claim, the

pleading must meet the particularity standard set forth in Fed. R. Civ. P. 9(b).  *Zavala v. Wal-*

*Mart Stores, Inc.*, 393 F. Supp. 2d 295, 312 (D.N.J. 2005), *aff'd* 691 F.3d 527 (3d Cir. 2012).

They may meet this requirement by pleading the "date, place or time" or by "injecting precision

and some measure of substantiation into their allegations." *Lum v. Bank of Am*., 361 F.3d 217, 224 (3d Cir. 2004).

<u>Legal Analysis</u>

The Court will first address the RICO claims over which it has original jurisdiction. RICO was intended by Congress to be a potent and flexible statute and the Supreme Court has instructed that it be read broadly. *Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 497 (1985); *Tabas v. Tabas*, 47 F.3d 1280, 1290-91 (3d Cir. 1995) (en banc). Nevertheless, this Court rejected the RICO theories in the original Complaint for numerous reasons and explained that it appeared that Plaintiffs were attempting to bootstrap a common law fraud claim into a RICO violation. In particular, the Court was concerned that the RICO claims, as pled, were based primarily on mailings and wire transfers made from one Plaintiff to the other Plaintiff. That remains the case in the Amended Complaint.

Plaintiffs contend that these averments are sufficient because Defendants "induced" them to engage in these activities. Plaintiffs point out, correctly, that mail fraud, wire fraud and the National Stolen Property Act have been defined broadly, and do not require the communications to be made by the defendant or to be, in themselves, fraudulent. *See Pereira v. United States*, 347 U.S. 1, 8 (1954) (To constitute a violation, "it is not necessary to show that petitioners actually mailed or transported anything themselves; it is sufficient if they caused it to be done."). The *Pereira* Court explained that "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id*. at 8-9. *Accord Tabas*, 47 F.3d at 1294 n. 18 (completely innocent and/or lulling mailings can satisfy the

8

mailing element, so long as those mailings are incident to an essential part of the scheme). *But see Schmuck v. United States*, 489 U.S. 705, 710-711 (1989) (the mailings or wire communications must be "incident to an essential part of the scheme," or a "step in [the] plot."); *United States v. Otto*, 742 F.2d 104, 108 (3d Cir. 1984) ("Not every use of the mails in connection with a scheme to defraud is punishable under section 1341. . . . the scheme's completion [must depend] in some way on the charged mailings.").

Plaintiffs reason that they can establish their RICO claims even if Defendants did not personally use the mails, wires, travel or transport goods across state lines because Defendants "induced" Plaintiffs to do so. Because the same alleged predicate acts and pattern of racketeering activity are fundamental to each of Plaintiffs' RICO theories, *compare* Amended Complaint ¶¶ 139-153 with 179-192, the Court will address this "inducement" theory directly.

A. The Alleged Predicate Acts

Plaintiffs allege the following RICO predicate acts: (1) mail fraud, in violation of 18 U.S.C. § 1341; (2) wire fraud, in violation of 18 U.S.C. § 1343; (3) interstate use of monies obtained by fraud, in violation of 18 U.S.C. § 2314; (4) interstate transportation of victims of fraud, in violation of 18 U.S.C. § 2314[6]; and (5) monetary transactions in property derived from fraud, in violation of 18 U.S.C. § 1957. These predicate acts are described in the Amended Complaint, Amended RICO Case Statement and Addendum.

The alleged mail fraud is clearly premised on the inducement theory. Defendants did not send any mailings. Instead, Plaintiffs contend that the operative mailings were "bank checks

---

[6] The Addendum adds another alleged violation of § 2314, the interstate transportation of stolen goods.

from Ferguson to Tomana." *See* Addendum. The Amended Complaint also alleges mail fraud in connection with the promotion of the Roan Auction.

The alleged wire fraud similarly consists of transfers of funds from a bank account of Plaintiff Ferguson in Florida to a bank account of Plaintiff Tomana in Pennsylvania. The dates and amounts of these transfers are pled with particularity.[7] *See* Amended Complaint ¶ 83. Plaintiffs also allege wire fraud based on advertisements/emails regarding the Roan Auction.

The various alleged violations of the National Stolen Property Act ("NSPA"), 18 U.S.C. § 2314, are also based on the "inducement theory" and will be addressed together. The "interstate use of monies obtained by fraud" is premised upon the fact that money had originally come from Plaintiff Ferguson to Plaintiff Tomana across state lines.[8] Amended Complaint ¶ 142-144; Amended RICO Case Statement at 18-19. The "interstate transportation of victims by fraud" is premised upon travel done by Plaintiff Ferguson himself, from his homes in Florida and Tennessee to Pennsylvania. Amended Complaint ¶ 82; Amended RICO Case Statement at 19-20. The "interstate transportation of stolen goods" allegedly occurred when Moeller sold items in other states. Amended Complaint ¶¶ 94, 95, 144. There are no facts pled as to the date, time or relation of these acts to the conduct of the enterprise, although Ohio, Virginia and Maryland

---

[7] By contrast, the Amended Complaint contains numerous conclusory allegations of wire fraud based on emails, telephone calls and text messages between Moeller, Tomana and Ferguson; emails between Tomana, Ferguson and Roan; emails between Moeller and out-of-state purchasers; advertisements for the sale of memorabilia on internet websites such as Craigslist without averments as to the date, time, place or other any supporting details to inject precision. Amended Complaint ¶ 145; Amended RICO Case Statement at 20-22. Accordingly, the Court will not accept these allegations in deciding the instant motion. *See Lum*, 361 F.3d at 224; *Santiago*, 629 F.3d at 130 n. 7.

[8] There are no factual allegations that Defendants themselves transported, transmitted or transferred monies in excess of $5,000 in interstate commerce.

are identified. Amended Complaint ¶¶ 47, 95. Thus, these allegations are conclusory and fail to meet the Rule 9(b) standard.

The final alleged predicate act, for a monetary transaction in property derived from fraud, 18 U.S.C. § 1957, is based on the single time that Tomana paid Moeller with a $30,000 check rather than cash. This averment is pled with specificity. The averment that Moeller deposited other moneys into his bank account(s) is conclusory. In particular, Plaintiffs have not alleged that any other deposits exceeded $10,000, as required by the statute.

### B. RICO Statutory Text

Plaintiffs argue that nothing in the RICO statute prohibits their "inducement" theory. To the contrary, the RICO statute does provide a textual basis to distinguish between the direct actions of Defendants and the "induced" actions of Plaintiffs.

The RICO statute, 18 U.S.C. § 1962, provides in relevant part as follows:

(c) It shall be unlawful for any **person employed by or associated with any enterprise** engaged in, or the activities of which affect, interstate or foreign commerce, **to conduct** or participate, directly or indirectly, in the conduct of **such enterprise's** affairs **through** a **pattern** of racketeering activity or collection of unlawful debt.

(Emphasis added). On its face, the RICO text focuses on the actions of persons "employed by or associated with" the enterprise. *See Shulton, Inc. v. Optel Corp.*, 1986 WL 15617, at *9 (D.N.J. Sept. 29, 1986) (*quoting United States v. Jannotti*, 729 F.2d 213, 226 (3d Cir. 1984)) (a person is "employed by or associated with" a RICO enterprise when he "is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or . . . [when] the predicate offenses are related to the activities

11

of the enterprise.")   Plaintiffs Ferguson and Tomana are the alleged victims of the fraud, not the employees or associates of Defendants.

In addition, the RICO text reflects that the "person" must "conduct" the affairs of "such enterprise" "through" a "pattern" of racketeering acts. Thus, the RICO statute requires a connection between the racketeering activities and the goals and operations of the enterprise.  In sum, the statutory focus is on the activities undertaken by persons employed by or associated with the enterprise to conduct its affairs.


   C.  RICO Cause of Action

The RICO statute does not simply provide for recovery of treble damages and counsel fees for every violation of the mail/wire fraud and NSPA statutes.  Instead, RICO is a separate statutory scheme which requires a plaintiff to demonstrate each element of a prima facie case, namely:  (1) the conducting of (2) an enterprise (3) through a pattern, (4) of racketeering activity (5) which results in injury to the plaintiffs' business or property.  *Sedima,* 473 U.S. at 496. Mail/wire fraud and NSPA violations address only one element of a RICO claim, in that they are among the enumerated offenses which may be considered as predicate acts of racketeering activity.

Not every mail/wire fraud or NSPA violation, *ipso facto*, constitutes a RICO violation. As the Supreme Court emphasized in *Sedima*, "mere commission of the predicate offenses" does not constitute a RICO violation.  *Id*.  Instead, "the essence of [a RICO] violation is the commission of those acts **in connection with the conduct of an enterprise**."  *Id*. at 497 (emphasis added).  *Accord Boyle v. United States*, 556 U.S. 938, 949-50 (2009) ("proof that a defendant conspired to commit a RICO predicate offense—for example, arson—does not

necessarily establish that the defendant participated in the affairs of an arson enterprise through a pattern of arson crimes."); *Eaton v. Jeff White's Auto Inc.*, 2014 WL 5780708, at \*5 n.5 (D. Del. Nov. 5, 2014) ("RICO was not designed to provide redress to one injured by another's commission of predicate acts. Rather, RICO was designed to provide redress to one injured by another's use of certain predicate acts to invest in, acquire or maintain an interest in, or conduct the affairs of an enterprise whose activities affect interstate commerce.").  In other words, it is not enough to allege that Defendants induced Plaintiffs to transfer money to each other, such that Defendants arguably committed  mail/wire fraud.  Instead, Plaintiffs must show that Defendants conducted the affairs of a RICO enterprise through a pattern of mail/wire fraud crimes.

D.  RICO Claims Premised on Mail/Wire Fraud

There is a tension in how courts have addressed RICO claims based on alleged mail/wire fraud.  On one hand, courts have recognized that Congress intended the RICO and mail/wire fraud statutes to be broad, flexible tools.  In *Tabas*, 47 F.3d at 1290, the Court noted the concern that the inclusion of mail/wire fraud as predicate acts would sweep many "garden variety fraud" and commercial cases within the scope of RICO, but nevertheless rejected judicial efforts to impose limits on the broad language adopted by Congress.  *Id*. at 1290-94 (citations omitted).  In particular, *Tabas* applied an expansive test for mail fraud predicate acts and stated that the mailings need not be relied upon by the victim of the fraud; the mailings themselves could be completely innocent; and the use of the mails need not be an essential element of the fraudulent scheme.  *Id*. at 1294 n. 18 (citations omitted).  All that is necessary is that "the mailings were incident to an essential part of the scheme."  *Id*.

On the other hand, courts have closely scrutinized RICO claims based on mail/wire fraud due to the danger of overbreadth. *See Kolar v. Preferred Real Estate Investments, Inc*., 361 F. App'x 354, 363 (3d Cir. 2010) (non-precedential) ("RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.") (citations omitted). Indeed, "[w]here acts of mail and wire fraud constitute the alleged predicate racketeering acts, those acts are subject to the heightened pleading requirement of Rule 9(b)." *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002) (*citing Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 657–58 (3d Cir. 1998)) (remanding to consider whether complaint stated clearly how the alleged mail/wire fraud contributed to the alleged fraudulent scheme). In *Annulli*, the Court of Appeals instructed that "when alleging mail and wire fraud as predicate acts in a RICO claim, plaintiff's pleadings must identify **the purpose of the mailing within the defendant's fraudulent scheme** and specify the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentations." 200 F.3d at 202 n. 10 (citing *Scheiner v. Wallace*, 860 F.Supp. 991, 997–98 (S.D.N.Y. 1994)) (emphasis added). Thus, the Court will apply a broad definition of the alleged mail/wire fraud predicate acts, but will closely scrutinize whether Plaintiffs have met the heightened Rule 9 standard by pleading sufficient facts to plausibly allege the "conducting" of an enterprise "through" a "pattern" of mail/wire fraud.

E. The Pattern Requirement

In *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1414 (3d Cir. 1991), the Court of Appeals for the Third Circuit set forth its most thorough analysis of mail fraud allegations and their effect on the "pattern" analysis. The Court explained that "a pattern requires more than

14

commission of the requisite number of predicate acts." *Id*. at 1412. Instead, a plaintiff must show both that the racketeering acts are "related" and that they amount to or pose a threat of continued criminal activity. *Id*. The Court recognized that "the mailing element is not very helpful in examining the sufficiency of a RICO pattern allegation." *Id*. at 1414. The Court instructed that courts must "look beyond the mailings and examine the underlying scheme or artifice." *Id*. For example, the number of alleged mail/wire fraud acts may be only tangentially related to the underlying fraud or a matter of happenstance. Instead, courts must examine "the actions which are alleged to form the basis of criminal activity" and "the instances of deceit constituting the underlying fraudulent scheme." *Id*. at 1413, 1414. In determining duration, the relevant conduct is the deceptive activity, not otherwise innocent mailings that may continue for a long period of time. *Id*. at 1418.

The Court also emphasized that the alleged predicate acts must be part of the "regular way of doing business" of the alleged RICO enterprise. *Id*. at 1414 (*quoting H.J., Inc. v. Northwestern Bell*, 492 U.S. 229, 250 (1989)); *Accord Tabas,* 47 F.3d at 1295 (continuity is established when the commission of the predicate acts is "a regular way of conducting defendant's ongoing legitimate business"). In *Kehr*, the Court held that the quantity of otherwise innocent invoices that were mailed could not transform an alleged fraud into a RICO pattern. *Id*. In a footnote, the Court cited *Fleet Credit Corp. v. Sion*, 893 F.2d 441 (1st Cir. 1990), for the proposition that the "pattern" element cannot be established by demonstrating that common law fraud was a regular way of conducting the RICO enterprise; rather a plaintiff must allege an "integral connection" between the alleged predicate acts of mail fraud and the alleged fraudulent scheme. *Id*. at 1415 & n.2. The *Kehr* Court assumed, arguendo, that two of the defendants had

committed mail fraud and that the plaintiffs had valid claims of common law fraud, but nevertheless concluded that they could not maintain a RICO suit. *Id*. at 1419.

In *Cooper v. Broadspire Servs., Inc*., 2005 WL 1712390, at *7 (E.D. Pa. July 20, 2005), the Court granted a motion to dismiss RICO claims premised on alleged mail/wire fraud. The Court held that although routine business mailings might serve as the basis for a charge of mail fraud, the plaintiffs had failed to show how the alleged predicate acts advanced the alleged RICO scheme. The Court stated: "plaintiff has not adequately plead the purpose of the mailings within the defendants' alleged fraudulent scheme." *Id.* at *8.[9]

### F. Application to the Circumstances of This Case

Without doubt, Plaintiffs have pled a cognizable claim of fraud. They were apparently duped by Moeller into buying counterfeit and/or stolen Civil War memorabilia. However, the Court concludes that Plaintiffs have not pled valid RICO claims.

It is well-established that "common law fraud" is not a RICO predicate act. *See, e.g., Giuliano v. Fulton*, 399 F.3d 381, 388 (1st Cir. 2005) ("we do not credit generic allegations of common law fraud that do not implicate the mails or wires, as these acts do not constitute racketeering activity under RICO."); *Accord Fleet Credit*, 893 F.2d at 445 ("acts of common law fraud that do not implicate the mails (or the wires) do not constitute 'racketeering activity' under the definition found within the RICO statute."); *Macauley v. Estate of Nicholas*, 7 F. Supp. 3d 468, 484 n. 12 (E.D. Pa. 2014) ("Fraud, forgery, or identity theft punishable under federal laws are also not racketeering activity, unless the acts are proscribed by any of the statutes listed in 18 U.S.C. § 1961(1)(B)-(G)."). In *Annulli v. Panikkar*, 200 F.3d 189 (3d Cir. 1999), *abrogated on*

---

[9] The Court also held that an allegation of "numerous telephone calls" had not been pleaded with the particularity required by Rule 9(b).

*other grounds by Rotella v. Wood*, 528 U.S. 549 (2000), the Court declined to include "theft by deception" within the scope of RICO racketeering activity and explained:

> if garden-variety state law crimes, torts, and contract breaches were to constitute predicate acts of racketeering (along with mail and wire fraud), civil RICO law, which is already a behemoth, would swallow state civil and criminal law whole. Virtually every litigant would have the incentive to file their breach of contract and tort claims under the federal civil RICO Act, as treble damages and attorney's fees would be in sight. We will not read language into § 1961 to federalize every state tort, contract, and criminal law action.

*Id.* at 200. So, Plaintiffs in this case have properly focused their allegations on mail/wire fraud and the National Stolen Property Act, all of which are explicitly included within the RICO definition of predicate acts.

However, there is a fundamental disconnect between the conduct that comprises the alleged RICO predicate acts in this case and the affairs of the alleged RICO enterprise. Even assuming, arguendo, that Plaintiffs have adequately pled mail/wire fraud,[10] they have failed to plead how Defendants conducted the affairs of an enterprise through a pattern of such predicate acts. The mails/wires and interstate transactions between Plaintiffs Ferguson and Tomana constituted their <u>own</u> affairs – they were not the affairs of the alleged enterprise. There is no indication that Defendants were even aware of these transfers between Plaintiffs. See Amended Complaint ¶¶ 83, 84, 86. Certainly, Defendants did not conduct the alleged RICO enterprise through the arrangements made between Ferguson and Tomana. *See Sedima*, 473 U.S. at 496-97 ("the essence of [a RICO] violation is the commission of those acts **in connection with the conduct of an enterprise**."); *Boyle*, 556 U.S. at 949-50 ("proof that a defendant conspired to commit a RICO predicate offense - for example, arson - does not necessarily establish that the

---

[10] The Court is not convinced that Plaintiffs have pled valid predicate acts of mail/wire fraud because they have not shown how the use of the mails/wires was "incident to an essential part of the scheme," or a "step in [the] plot." *See Schmuck*, 489 U.S. at 710-711.

defendant participated in the affairs of an arson enterprise through a pattern of arson crimes."); *Kehr Packages*, 926 F.2d at 1415 n.2 (predicate acts – not common law fraud -- must be part of the regular way of doing business of the enterprise).

The scheme to loot the Connell Collection occurred wholly in Pennsylvania, without any alleged use of mails or wires. Moeller apparently paid the Connell Defendants in person for various items and/or used his key to the museum. There are no specific details pled regarding Moeller's use of mails and/or wires in obtaining other memorabilia or in obtaining the services of the engraver to fraudulently alter items.[11] Nor did Moeller use the mails/wires or interstate commerce in the transactions with Plaintiffs. Instead, Ferguson and Tomana travelled to Pennsylvania and paid him in cash. The conduct pled as the basis for predicate acts largely arose from Plaintiffs' own activities which led up to the purchases, and Plaintiffs' decision to subsequently attempt to auction the items after they had already bought them from Moeller. As explained above, Plaintiffs are not "employed by or associated with" the enterprise and Plaintiffs' own actions cannot serve as a substitute for Defendants' actions as to the manner through which the affairs of the enterprise were conducted.

After stripping away the actions performed by Plaintiffs and the conclusory allegations that do not meet the Rule 9(b) particularity requirements, the remaining averments do not establish a pattern of racketeering activity. *See H.J.*, 492 U.S. at 239 ("to prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." ) Plaintiffs concede that "many of the acts committed by the Defendants were not predicate acts," including the false engravings, many of the misrepresentations, and the looting of the Connell Collection. Plaintiffs' Brief at 12.

---

[11] Such allegations fall far short of the Rule 9 particularity standard.

What remains is that Moeller allegedly committed common law fraud against Plaintiffs for a period of seventeen months and, on one occasion, deposited a $30,000 check from Tomana into his bank account. Moller's participation and input regarding the Roan Auction and catalog clearly falls within the definition of "lulling" activity, but those activities occurred over a very short window of time.[12] These averments do not rise to either a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. *Id.* at 241.

### G. Plaintiffs' Other Arguments

Plaintiffs point out that RICO was intended to target the theft and subsequent sale of stolen and counterfeit goods, such as the conduct in which Defendants allegedly engaged. *See United States v. Turkette*, 452 U.S. 576, 588-89 (1981) (citing statement of findings in the preface to RICO). While RICO should be construed broadly to effectuate its purposes, Plaintiffs have not alleged a RICO violation in this case based on theft, sales of stolen goods or counterfeiting, but instead have grounded their RICO claims on the induced predicate acts of mail/wire fraud, interstate use of moneys obtained by fraud, interstate transportation of stolen goods, interstate transportation of victims; and monetary transactions in property derived from fraud. This Court is constrained to apply the applicable statutory text and case law to the predicate acts as alleged in the Amended Complaint.

---

[12] It is unclear how the Plaintiffs were victimized by the alleged predicate acts associated with publicity for the Roan auction. Those acts occurred <u>after</u> Plaintiffs had paid $670,000 to Defendants, and thus, could not have caused those losses. Similarly, Plaintiffs cannot base their RICO theory on any prospective injuries that may have been suffered by potential purchasers at the Roan auction. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267-69 (1992).

Plaintiffs rely heavily on *Del Sole v. Knoedler Gallery, LLC*, 974 F. Supp.2d 274 (S.D.N.Y. 2013), which involved RICO claims arising out of sales of forged abstract expressionist paintings for $60,000,000.00 over a decade. The *Del Sole* Court allowed RICO claims to survive motions to dismiss as to several of the defendants, including an art gallery and its president, but dismissed the RICO claims as to the owner of the art gallery. The Court accepted the argument that defendants could be held liable for having "caused" the use of mails and wires. However, the complaint showed that the defendants had personally used the mails and wires. To wit:, they had negotiated the sales price by telephone; sent the invoice by mail from New York to New Mexico; received payment of $8.4 million by wire; and faxed a letter to assure the buyer that the painting was authentic. *See id*. at 307. By contrast, in this case Moeller remained in Pennsylvania and Plaintiffs paid him in cash. The *Del Sole* Court rejected the RICO claim of co-plaintiff Howard, even though he had alleged that artwork had been shipped interstate, payments had been transmitted by mail and wire, and members of the enterprise had engaged in multiple emails and phone calls. The Court explained that these allegations "were not sufficient to allege a pattern of racketeering activity." *Id*. at 309.[13] In sum, the Court is not convinced that *Del Sole* mandates a different result in this case.

Conclusion

The Court is mindful that RICO is intended to be a broad and flexible tool, and that numerous other judicial efforts to place limits on RICO have proven fruitless. Nevertheless, the Court reluctantly concludes that Plaintiffs' "inducement" theory in this case stretches the scope of RICO too far. Defendants who engaged in local fraud cannot

---

[13] The Court subsequently upheld additional RICO claims after the Complaints were amended. *See* 137 F. Supp.3d 387 (2015); 2015 WL 5918458 (October 9, 2015).

be exposed to treble damages and counsel fees based on the actions of their victims. The Court has accepted the allegations of the Amended Complaint as true, to the extent that they satisfy Rule 9(b), but simply disagrees that Plaintiffs' have pled a viable legal theory. Accordingly, it would not be consistent with the just, speedy and inexpensive determination of this matter, *see* Fed. R. Civ. P. 1, to permit the parties to engage in discovery.

In summary, the Court concludes that Plaintiffs have failed to plead cognizable RICO claims[14] and Counts I-IV of the Amended Complaint will be dismissed.

Supplemental Jurisdiction Over State Law Claims

Jurisdiction over supplemental state law claims is governed by 28 U.S.C. § 1367(a), which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The Court has discretion to decline to exercise supplemental jurisdiction, if it "has dismissed all claims over which it has original jurisdiction," or if "in exceptional circumstances, there are compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(3), (4). As to (c)(3), "the district court ***must*** decline to decide the pendent state claims unless considerations of judicial economy, convenience and fairness to the parties provide an affirmative justification for [exercising supplemental jurisdiction]." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in

---

[14] The RICO § 1962(d) conspiracy claims in this case also rely on the inducement theory and fail for the same reasons set forth above.

original). As to (c)(4), a court must evaluate "economy, convenience, fairness, and comity." *Mathis v. Camden County*, 2009 WL 4667094 at *9 (D.N.J. 2009).

For the reasons set forth above, Plaintiffs have failed to plead cognizable RICO claims over which this Court has original jurisdiction. Therefore, the Court "must" decline to exercise supplemental jurisdiction over the pendent state law claims in Counts V-VIII of the Complaint. As this case is in its earliest pleading stage, the (c)(4) considerations also weigh in favor of declining supplemental jurisdiction.

Leave to Amend

Ordinarily, leave to amend should be liberally granted. However, the Court has already permitted Plaintiffs one opportunity to file an Amended Complaint and warned that it is unlikely to permit any subsequent amendments. It would be inequitable and futile to allow a third bite at the apple. Accordingly, the case will be dismissed without prejudice to Plaintiffs' ability to pursue their state law claims in the Pennsylvania court system.

An appropriate Order follows.


McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROGER J. FERGUSON and MICHAEL J. TOMANA,** | ) |
| **Plaintiffs,** | ) |
| | ) **2:16-cv-41** |
| **v.** | ) |
| | ) |
| **JOHN J. MOELLER, MEGAN KRESS, KIMBERLY A. CONNELL and GREGORY C. CONNELL,** | ) |
| **Defendants.** | ) |

## ORDER OF COURT

AND NOW, this 30th day of August 2016, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED that the MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6) FILED ON BEHALF OF DEFENDANT JOHN J. MOELLER (ECF No. 25) is **GRANTED IN PART**. Counts I through IV of Plaintiffs' Amended Complaint are **DISMISSED**. The Court declines to exercise supplemental jurisdiction over Counts V through VIII of the Amended Complaint and the dismissal is without prejudice to Plaintiffs' right to pursue these claims in the state courts.

The clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge

cc:  **All counsel of record**
Via CM/ECF